In the Matter of the Arbitration Between

GREATER LYNN SENIOR SERVICES

-and-

TEAMSTERS LOCAL UNION NO. 42

Grievances:
Grace Period
Unauthorized Vehicles

Arbitrator: James M. Litton, Esq.

Appearances:

Nathan L. Kaitz, Esq.          – for Greater Lynn Senior Services

Gabriel O. Dumont, Esq.        – for Teamsters Local Union No. 42

## OPINION AND AWARD

### Issues:

Greater Lynn Senior Services (GLSS or Employer) and Teamsters Local Union No. 42 (Union) were unable to stipulate to the issues to be determined in this case. GLSS proposed the following:

> 1.   Did the Agency violate the collective bargaining agreement on or about June 10, 2015, when it modified the 10-minute grace period for a late arrival at work without bargaining with the Union?  If so what shall be the remedy, if any?
>
> 2.   Did the Agency violate the collective bargaining agreement on or about February 9, 2016 when it changed the penalty for unauthorized use of vehicles without bargaining with the Union?

The Union proposed the following:

-1-

> 1.   Absent bargaining to resolution with the
> Union regarding a change in Article 15 of
> the current collective bargaining agreement
> and/or in the Rule Book, did the Employer
> violate   Article   15   (Discipline   and
> Discharge) <u>when it discharged employees</u> for
> a   1st   offense   "Unauthorized   use   of   GLSS
> vehicle?
>
> 2.   Absent bargaining to resolution with the
> Union regarding a change in Article 15 of
> the current collective bargaining agreement
> and/or in the Rule Book, did the Employer
> violate   Article   15   (Discipline   and
> Discharge) <u>when it disciplined employees</u>
> based on the reduced 5-minute grace period?
> If  yes,  what  shall  the  remedy  be?  (all
> emphasis above added)

In light of their inability to stipulate to the phrasing of
the issues to be determined in this case, the parties authorized
the undersigned to phrase the issues.   In accordance with that
authorization, I select the issues as the Agency phrased them to
be the issues decided herein.   I select the Agency's proposed
issues because they more closely mirror the language of the
underlying grievances which are at issue here.   Specifically,
the Union phrased its grievances in terms of unilateral change
rather than in terms of discipline.   The Union referred to
discipline only with respect to the remedy it sought through the
grievance procedure. In one of its two grievances the Union
seeks reversal of discipline as a remedy for the Agency's
imposition of alleged contractually violative unilateral change.
In the other it does not because the Agency assessed no
discipline pursuant to the new rule.

<u>Relevant Contract Provisions:</u>

Article 11
Management Rights

-2-

A.   <u>Except as expressly restricted by a specific provision of this Agreement,</u> the Agency retains all rights, powers, and authority exercised or held by it prior to the certification by the National Labor Relations Board of the Union as the collective bargaining agent of the employees covered by this Agreement. (emphasis added)

B.   Without limiting the generality of the foregoing, <u>these rights shall include,</u> but are not limited to, the exclusive right and sole discretion to: direct and manage its business; determine all business and financial policies; determine all methods, products and schedules of production; install new machinery, methods, materials or processes; change or eliminate existing equipment, methods, materials or processes; select and determine the number and qualifications of employees required; direct the work force; schedule and assign work or shifts to specific employees or work to specific equipment (i.e., vehicle or type of vehicle); determine the starting and ending time and the number of hours to be worked; determine and change the methods of operating its business; add or discontinue processes or operations in whole or in part, temporarily or permanently; hire, assign, transfer and promote employees; lay off, terminate or otherwise relieve employees from duty for lack of work or other business reasons; suspend, demote, discipline and discharge employees for just cause; determine and change at its sole discretion the number of locations of its operations; relocate its operations; to abide by directives of contracting authorities, regulatory authorities or funding sources as to operations governed by such contracts or funding; and <u>adopt from time to time reasonable rules and regulations for the purposes of efficiency, safety and discipline</u>. (emphasis added)

C.   The foregoing enumeration of specific rights retained by the Agency is not

intended to be a waiver of any rights of the Agency not listed unless specifically surrendered in this Agreement, whether or not such rights have been exercised by the Agency in the past.

D.   The management rights recited above are not subject to the grievance and/or arbitration procedure of this Agreement unless in the exercise of such rights the Agency has violated a specific provision of this Agreement.

## Article 15
## Discipline and Discharge

A.   The Agency may discipline or discharge employees for just cause.   Notice of any such discipline shall be given to the employee, as well as to the Union. (emphasis added)

B.   The possible forms of discipline may range from a verbal or written warning, to suspension, to discharge.   Some offenses, including, but not limited to, theft, dishonesty, actual or threatened violence, insubordination, deliberate damage to property or equipment.   Being in possession of or under the influence of alcohol or drugs, will, if proven, justify immediate termination of employment, subject to the just cause standard set forth in Section A.

A preventable motor vehicle accident, involving an injury of any person, in which negligence of the operator contributed to the accident, will, if proven, justify immediate termination of employment, subject to the just cause standard set forth in Section A.

Failure to tie down a wheelchair properly which leads to any irregular wheelchair movement, may, if proven, justify a thirty (30) day suspension for a first offense.   A second offense, will, if proven, justify immediate termination of employment, subject

to the just cause standard set forth in Section A.

As to other offenses, employees will ordinarily be provided a warning and/or a suspension prior to discharge unless the severity or nature of the offense or other factors are such that the Agency deems more serious discipline to be appropriate.

C.   If an employee is arrested or charged with any criminal offense, the employee must report the arrest or charge to Human Resources and submit a police report or any other documentation concerning the incident. The report must occur within five (5) business days of the incident.   Based on the facts of the charge or the arrest, an employee may be suspended, without pay, pending the outcome of their case if the charges may be a liability to the Agency or the Agency's clients.

Non-compliance or misrepresentation of the above stated requirement may serve as grounds for termination.

For employees hired after the date of the signing of this agreement, suspensions without pay, resulting out of the above requirement, will in no case exceed twelve (12) months.   If an employee is unable to return after the twelve (12) month period, the employee's employment with the Agency will be terminated.

G. Progressive discipline for preventable motor vehicle accidents will be as follows:

...

Operators may be subject to disciplinary action, up to and including discharge, for accidents which are deemed by the Agency to be preventable.

The following is the process for administering progressive discipline for

-5-

preventable accidents occurring within a
fifteen (15) month rolling period:

- 1st Occurrence – Verbal Warning
- 2nd Occurrence – Written warning with a
  minimum of one (1) hour of paid
  retraining through an online defensive
  driving program.
- 3rd Occurrence – 1–day suspension
  without pay with a minimum of five (5)
  hours paid retraining through DDC4.
- 4th Occurrence – 3–day suspension and
  final warning, two (2) suspension days
  without pay, with the third day, the
  employees attends eight (8) paid hours
  of overall paratransit operator
  retraining.
- 5th Occurrence – Discharge.

## Facts Presented:

GLSS and the Union are parties to a collective bargaining
agreement effective for the period January 1, 2014 through
December 31, 2018 (Agreement).  The Agreement sets forth the
wages, hours, terms and conditions of employment of certain
employees of the Agency in a bargaining unit comprised of
drivers.

The Agreement is the third collective bargaining agreement
between the parties since the Union organized GLSS drivers in
2006.

### 1.  Bargaining history

The parties' first contract was effective for the period
June 1, 2006 through December 31, 2008.  That contract contained
the following provision concerning progressive discipline:

> B.   The possible forms of discipline may
> range from an oral or written warning, to
> suspension, to discharge.   Some offenses,
> including, but not limited to, theft,
> dishonesty, actual or threatened violence,
> insubordination, deliberate damage to
> property or equipment, or being in
> possession of or under the influence of
> alcohol or drugs, will, if proven, justify
> immediate termination of employment, subject
> to the just cause standard set forth in
> Section A.   As to other offenses employees
> will ordinarily be provided a warning and/or
> a suspension prior to discharge unless the
> severity or nature of he offense or other
> factors are such that the Agency deems more
> serious discipline to be appropriate,
> subject to the just cause standard set forth
> in Section A.

It also contained the following in its Management Rights
provision:

> ... [t]hese rights shall include ... the
> exclusive right to: ... abide by directives
> of the Massachusetts Bay Transportation
> Authority and/or other contracting
> authorities or funding sources as to
> operations governed by such contracts or
> funding; ... .

The parties' second collective bargaining agreement was
effective for the period January 1, 2009 through December 31,
2013.   That contract maintained the progressive discipline
provision from its predecessor contract and added the following
language in a new paragraph C:

> Discipline for no call/no show shall be on
> the following schedule:  First offense: one
> day suspension (to be served on date of no
> call/no show), Second offense:  Three day
> suspension;  Third offense: termination.

The parties' third collective bargaining agreement is the Agreement under which the grievances at issue in this case arose.    The Agreement includes changes to Article 15. Specifically, it includes language regarding discipline for certain preventable accidents, language which specifies a disciplinary progression for failure to properly tie down wheelchairs, language calling for suspension for certain criminal charges or arrests.

## 2.  Prior arbitration awards

The Union introduced three arbitration cases into evidence. Each of the decisions involved the discharge of a GLSS driver for a single failure to tie down a wheelchair with a so-called "bunny belt" or "body belt."    Each case is summarized as follows:

### a.  Arbitrator Philip Dunn award

The grievance which is the subject of the award arose under the first collective bargaining agreement between the parties. In his decision Dunn found that GLSS did not have just cause to summarily discharge the grievant.    In that case GLSS argued that Article 11 allowed it to exercise "the exclusive right and sole discretion to: abide by directives of the MBTA ..." and that it could, therefore, override progressive discipline language as it is set forth in Article 15.    Dunn disagreed.    He wrote the following:

> First, Article 11, Management Rights" starts out with the explicit, limiting language, "Except as expressly restricted by a specific provision of this Agreement (emphasis added), the Agency retains all rights, powers, and authority ... held by it

> prior to the certification by the NLRB ..."
> Then, in Article 15, the parties expressly
> and specifically agree "The Agency may
> discipline or discharge for just cause"
> (emphasis added) ... Quite simply, the
> explicit "just cause" limitation in Article
> 15 constitutes "a specific provision of this
> Agreement which expressly restricts the
> management rights which are listed in
> Article 11. Thus, the just cause language
> in Article 15 places a limitation upon the
> Article 11, listed management right of GLSS
> "to ... abide by directives of the MBTA,"
> not the other way around."

Thus, Dunn, found as follows:

> ... the traditional just cause analysis is
> required in this case, including within it
> due consideration of progressive discipline
> which is a well-established, core component
> of the just cause concept in labor
> relations.

### b.   Arbitrator Michael Ryan award

The grievance in this case also involved the summary discharge of a driver for failure to use a body belt on a client's wheelchair. Ryan agreed with Dunn about the relationship between the Management Rights provision and the Discipline and Discharge provision of the Agreement. Ryan wrote that

> ... [t]he just cause language of Article 15
> is a "specific provision of th[e] Agreement"
> that limits the management rights language
> of Article 11.

Ryan also wrote the following:

> Initially, it must be stated that the
> Agency's repeated statement to the drivers
> that failure to use the bunny belt would

> result in termination does not establish the
> appropriateness of a summary discharge. The
> Agency and the Union have negotiated a just
> cause clause, which impedes that Agency from
> unilaterally setting penalties for
> disciplinary offenses as it sees fit. The
> parties took some trouble to address the
> possible range of penalties in Article
> 15(B). The Agency cannot overcome a
> negotiated just-cause provision, and
> particularly one that expressly contemplates
> progressive discipline for this type of
> misconduct, with a unilaterally promulgated
> disciplinary rule.

As did Dunn, Ryan found the discharge of the grievant to have
been in violation of Article 15.

### c.  Arbitrator Richard Boulanger award

Again, the grievance in this case focused on the summary
discharge of a driver who failed to use a bunny belt. It argues
that "Boulanger rejected the Employer's argument" that it had
the unilateral right to change disciplinary penalties as set out
in its Rule Book and in Article 15 of the Agreement as follows:

> The Rule Book Disciplinary Grid is compliant
> with the Article 15(B) progressive
> disciplinary scheme and it is not challenged
> by the Union. However, while the body belt
> rule itself is a reasonable one pursuant to
> the management rights article, the
> termination penalty for its first violation
> is not reasonable in view of Article 15(B)
> dictates and those of the Rule Book.
> Immediate termination of employment for a
> first offense rule's violation without the
> benefit of progressive discipline has
> drastic consequences for the discharged
> employee. In the instant case, unless the
> body belt violation is included in article
> 15(B) immediate terminable offenses per
> agreement of the parties, there is no reason
> for its exclusion from Article 15(B) and

> Rule Book progressive disciplinary formula
> which includes safety violation categories.
> Therefore, the summary discharge penalty for
> a first body belt violation cannot stand.
> Discipline for violation of body belt rules
> shall be in accord with the Rule Book's
> Disciplinary Grid for safety violations
> compliant with the Article 15(B) just cause
> progressive discipline formula.

Boulanger found the discharge of the grievant to have been in violation of the Agreement.

3. Alleged unilateral changes

a. Tardiness grace period

In June 2015 the Agency's Rule Book included a "Lateness" provision which referred the reader's attention to the Agency's Handbook.  Sec. 1.3(e) of the Handbook includes the following with respect to "attendance':

> ...
> Employees are expected to be on time.
> Continued lateness will not be tolerated and
> will result in disciplinary action.  If you
> are unavoidably detained, call the
> dispatcher immediately.
>
> Two occurrences of lateness during any
> thirty (30) day period of more than ten (10)
> minutes is considered excessive.  A first
> offense will result in a verbal warning.  A
> second offense in a twelve-month period will
> result in a written warning.  A third
> offense in a twelve month-period will result
> in a three-day suspension.  A fourth offense
> is a twelve-month period will result in
> discharge.

On June 17, 2015 GLSS Director of Transportation, Steven Epps, sent all employees the following memorandum regarding "time clock rules and procedures":

Every hourly Employee is required to have an accurate account of hours worked by "punching in" and "punching out" for their assigned work. The purpose of this Memorandum is to clarify the current Time Clock Rules and Procedures of GLSS and minimize any oversights and abuses within the agency.

This is being brought forth to raise awareness that tardiness leads to late pull outs, which further leads to late trips and fines incurred by the agency. This also creates an additional burden on the driver work force, but also affects all of the other departments as well.

**PUNCHING IN**

- Employees are required to "punch in" on time for work at their scheduled start time.

- Punching in for work **ANYTIME** after your scheduled start time is considered being **"TARDY"**.

- Punching in for work **TEN (10) MINUTES** or **MORE** after your scheduled start time is known as an **"EXCESSIVE TARDY"**.

- Unless you have permission to do otherwise, you may not "punch in" for work more than five (5) minutes prior to your scheduled start time.

Violations of these procedures may result in disciplinary action up to and including termination. ...

The distribution of the immediately above memorandum resulted in the Union's first ULP charge dated June 23, 2015.

On November 7, 2016 GLSS sent an e-mail to the Union which notified it of a "new time and attendance and payroll system (called Payright) we anticipate 'going live' within all of GLSS

on Saturday, December 24, 2016." That memorandum explained Payright in some detail, and it included the following description of its "minute for minute" timekeeping:

> Unlike GLSS' current time and attendance system, our new time and attendance system records time on a minute for minute basis. There will no longer be "rounding" of time to the nearest quarter hour as of December 24, 2016, with the new Payright System.
>
> Employees who are required to punch a time clock to record their work hours are allowed a five (5) minute grace period before the scheduled start time, however, will be coded as an "in early" infraction and automatically be flagged by the system. Similarly, said employees are allowed a five (5) minute grace period after the scheduled start time of their shift. Any time punch that is more than five (5) minutes after the employees' scheduled start time (beginning with six (6) minutes), will be coded as an "in late" infraction and automatically be flagged by the system.

### b. Unauthorized use of GLSS vehicle

GLSS has long had a rule against unauthorized use of its vehicles for personal use. For example, its 1995 Rule Book had a three-step progression of discipline for such an offense: written warning for a first offense, 3-day suspension for a second offense, and discharge for a third offense. The 2007 Rule Book collapsed the disciplinary progression to two steps: 3-day suspension for a first offense and discharge for a second offense.

The Agency has repeatedly informed its drivers of the rule against unauthorized use of a GLSS or MBTA vehicle. For

example, on December 15, 2010 the Agency sent the following memorandum to its drivers:

> We have received a directive from the MBTA
>
> According to our contract drivers are not allowed to use vehicles to go to their homes.  It is considered unauthorized use of a company vehicle.
>
> We can be fined and or they can actually terminate our contract for this infraction.
>
> Please be advised that effective immediately, **you <u>cannot</u> use our vehicles to go to your homes or do personal business or errands.**  The MBTA has access to our records and all the information on all employees that work for them or are under contract to them. (emphasis original)
>
> Failure to comply may result in disciplinary action up to and including termination.

On July 7, 2015 the Agency issued the following memorandum regarding "the unauthorized use of GLSS owned and MBTA vehicles" to its drivers:

> ...
> Please be advised that drivers cannot use agency vehicles to go to their homes, conduct personal business or run errands at any time ... Failure to comply with this directive may result in disciplinary action up to and including termination.

On January 6, 2016 GLSS posted the following notice:

> YOU ARE NEVER ALLOWED TO TAKE A COMPANY OR MBTA OWNED VEHICLE HOME FOR ANY REASON ANY TIME !!!!!

GLSS acknowledges that "in or about January 2016 [it] eliminated the progressive discipline policy for unauthorized

use of a company vehicle and implemented a policy of immediate termination for the unauthorized use of a company vehicle."

## Genesis of the grievances

On June 23, 2015 the Union filed with the National Labor Relations Board (NLRB) an unfair labor practice (ULP) charge against GLSS in Case No. 01-CA-154720.  The charge alleged a violation of Sec.8(a)(1) and (5) of the National Labor Relations Act (Act or NLRA).  The basis of the charge was as follows:

> The Agency notified the Union on June 10, 2015, that they were unilaterally changing a time clock policy which has discipline attached which is a mandatory subject of bargaining.  The Union demanded bargaining on June 11, 2015 in an e-mail to Marie Castineyra, the Labor Relations Manager. The Company implemented the policy without bargaining.  By this unilateral implementation, the Company is violating the NRA.  The Union demands bargaining on this change and that all conditions be put back to pre-change conditions.

On March 3, 2016 the Union filed with the NLRB a second ULP charge against GLSS in Case No. 01-CA-172264.  Again, the charge alleged a violation of Sec. 8(a)(1) and (5) of the Act.  The basis of the second charge was as follows:

> The Union was notified on 2/9/2016, that the Employer was unilaterally changing the negotiated rule book policy on uses of vehicle – penalty change.  The Union demanded bargaining over this change.  The Employer refused to bargain and implemented the rule change.  By this unilateral implementation, the Company is violating the NLRA.  The Union demands bargaining on this change and that all conditions be put back to pre-change conditions and that any employees affected by this change be

> returned to work with all back pay and benefits.

On July 5, 2016 and on July 26, 2016 the NLRB administratively deferred, respectively, the two then-pending charges to be processed pursuant to the grievance and arbitration provision of the Agreement.

Subsequent to the NLRB's deferral notice to the parties, the Union filed a grievance in each case.  On November 18, 2016 the Union filed the following grievance:

> On June 10, 2015, GLSS announced a unilateral implementation of a substantial change to the Attendance Policy that has been in place since 1995 which eliminated the 10-minute grace period for a late arrival to work.

> The Union demanded bargaining over this change.  GLSS refused to bargain this mandatory subject of bargaining.

> The Union contends a violation of the NLRA and any relevant provisions of the CBA and past practice.

> The Union seeks to have the rule put back to pre-change conditions, all discipline assessed under this new rule since 2015 be removed and the Company bargain over the unilateral change to the Rule Book.

On November 21, 2016 the Union filed a second grievance as follows:

> On February 9, 2016, GLSS informed the Union that it was unilaterally changing the negotiated rule book policy on uses of vehicle – penalty change.

-16-

The Union demanded bargaining over this change. GLSS refused to bargain this mandatory subject of bargaining.

The Union contends a violation of the NLRA and any relevant provisions of the CBA and the Rule Book and past practice.

The Union seeks to have the rule put back to pre-change conditions, all discipline assessed under this new rule since 2/9/2016 be removed and the Company bargain over the unilateral change to the Rule Book.

These two grievances result in this arbitration.

Opinion:

Position of the Union

The position of the Union is that "the Agency violated the collective bargaining agreement when it unilaterally eliminated progressive discipline for a violation of the unauthorized use of GLSS vehicle" and that "it violated the collective bargaining agreement further when it unilaterally reduced the tardy grace period from a 10-minute period to a 5-minute period."

1. Unauthorized use of GLSS vehicle

The Union argues that "quite literally, this dispute represents the Employer's fourth bite at the proverbial 'apple,' except, in this instance, the Employer's argument is based on even weaker facts than the facts involved in the matters before Arbitrators Dunn, Ryan, and Boulanger." First, the Union argues that "in all three cases, the Employer pointed to and relied upon written directives to its employees that expressly advised them that they would be terminated for a single violation of the body belt directive." It argues that "in contrast, in the

-17-

instant case, of the four memos introduced by the Employer, one memo does not refer to any disciplinary consequences for taking a Company or MBTA owned vehicle home while the remaining three memos warn the drivers of 'disciplinary action up to and including termination'."

Second, the Union argues that "unlike in the three prior arbitrations, there is no evidence that the MBTA was directing that drivers who took their vehicles home or who used the vehicle for any other personal use, be terminated."

Third, the Union argues that "in the previous arbitrations, the Arbitrators considered and relied on the progressive discipline that was attached in the Rule Book to safety-specific, but more general violations, found in the Rule Book." It argues that "in the instant case, the Rule Book contains a 3-step progressive discipline for the very specific violation of 'Unauthorized use of GLSS vehicle'. It argues that "accordingly, the reasoning of Arbitrators Dunn, Ryan, and Boulanger should apply with even greater force to the instant facts."

## 2.  Reduction of the grace period

The Union argues that "from at least 1995 until the action giving rise to this dispute, the Employer, as part of the Rule Book, had a disciplinary rule concerning 'Lateness,' which is Sec. b. of the Nature of Actions violation category 'Unauthorized Absences'."  It further argues that "the Lateness rule refers the reader to 'Handbook Section 1.3e for more information'."  It argues that "Sec. 1.3e has remained unchanged since 1995" and includes the following:

> Two occurrences of lateness during any
> thirty (30) day period of more than ten (10)

> minutes is considered excessive. A first offense will result in a verbal warning. A second offense in a twelve-month period will result in a written warning. A third offense in a twelve-month period will result in a three-day suspension. A fourth offense in a twelve-month period will result in discharge.

The Union argues that "the Employer, without bargaining with the Union, first modified the Lateness violation such that punching in to work any time after an employee's scheduled start time was considered a 'Tardy' and, according to the Employer's June 17, 2015 posting, violations of the new 'Tardy' policy could 'result in disciplinary action up to and including termination'." The Union argues that "this action by the Employer resulted in the Union filing an unfair labor practice charge with the NLRB that, in turn, resulted in the NLRB issuing a Complaint and Notice of Hearing." It further argues that "the issues raised by that Complaint were deferred to arbitration by an Order dated October 5, 2016. It argues that "in that Order, the Regional Director stated that 'the change in the tardiness policy and practices, and the failure to bargain over that change, as generally alleged in the charge, is encompassed by the terms of the collective bargaining agreement.

The Union also argues that "the Employer, again without bargaining with the Union, in or about November 3, 2016, subsequently modified the 'Tardy' policy to provide for a 5-minute grace period before the employee was 'flagged by the system' as 'in late'." It argues that "subsequently, in a posting dated December 15, 2016, the Employer stated that 'employees who are required to punch a time clock to record their work hours are expected to be 'punched in' by the scheduled start time of the shift ... any time punch that is more than five (5) minutes after the employees' schedule start

time, will be coded as an 'in late' infraction, is automatically flagged by the system and could be subject to discipline'." The Union argues that "while the posting introduced the possibility of discipline for late time clock punches, the notice that was subsequently attached to the employees' paychecks did not refer to the possibility of discipline."

The Union further argues that "prior to the Employer's unilateral implementation of the 5-minute grace period, the Employer and the Union had negotiated attendance policies including the introduction of the 'no call/no show' disciplinary policy negotiated into Article 15 of the 2009-2013 collective bargaining agreement." It further argues that "in addition, more recently, the parties modified Article 15 in the 2014-2018 collective bargaining agreement by adding a 'preventable motor vehicle accident, involving an injury of any person, in which negligence of the operator contributed to the accident' as a cardinal offense for which an employee would be subject to immediate termination; a 2-step discipline progression ... for 'a failure to tie down a wheelchair properly which leads to any irregular wheelchair movement;' an immediate suspension of an 'employee is arrested or charged with any criminal offense ... pending the outcome of their case if the charges may be a liability to the Agency or the Agency's clients;' and a 5-step 'progressive discipline for preventable accidents occurring within a fifteen (15) month rolling period'." It argues that, "most recently, the Union and the Employer, in August 2016, negotiated a 'merger' of the discipline charts contained in the 1995 and 2007 Rule Books, and, as part of that process, agreed that six of the disciplinary rules would no longer be in force and effect and would be removed from the Rule Book."

The Union rejects GLSS' argument that the Management Rights provision of the Agreement "allows it to adopt the 5-minute grace period, disciplinary rule without bargaining with the Union." Specifically, the Union argues that the provision which states that management rights shall include "the exclusive right and sole discretion to: ... adopt from time to time reasonable rules and regulations for the purposes of efficiency, safety, and discipline" does not refer to "attendance or tardiness and even the reference in Article 11 to GLSS' right and sole discretion to adopt 'rules and regulations' is ambiguous and constrained as those rules must be 'reasonable' and must be adopted only 'for the purposes of efficiency, safety, and discipline'."

Finally, the Union argues that

> "in light of Article 11's general language, the inclusion in Article 11 of express restrictions on GLSS' right to adopt rules and regulations, the parties' bargaining history concerning disciplinary rules including specific changes to the Rule Book, lad the presence in the parties' collective bargaining agreement of an extensive and separate Discharge and Discipline article, it is clear that GLSS' argument which is based solely on the language of the Management Rights clause, that Local 42 waived its right to bargain over the elimination of the 10-minute grace period when it entered into the current collective bargaining agreement is not well-grounded.

## Position of GLSS

## 1.  Reduction of the grace period

The position of GLSS is that it "did not violate the Agreement when it modified the 10-minute grace period for a late

arrival to work without bargaining with the Union." GLSS argues that "it has bargained over its right to make changes to its Rule Book." Specifically, it argues that "Article 11 of the collective bargaining agreement grants the Agency the right to direct and manage the business, as well as, more particularly, the right to 'adopt from time to time reasonable rules and regulations for the purposes of efficiency, safety and discipline'." It argues that "clearly, the modification of the 10-minute grace period for late arrival to work is a rule and/or regulation for purposes of efficiency." It argues that "employees who arrive to work late create efficiency problems for the Agency as those employees can then be late for picking up their first passengers (and potentially remain late for the remainder of the day)." It argues that "employees who are late for picking up and/or dropping off passengers can result in fines to the Agency from the MBTA." It argues that "in fact, that was becoming more and more the case and more and more of a problem for this Agency when it modified the 10-minute grace period in June 2015."

The Agency argues that both "arbitral precedent" and "NLRB precedent" support its "right to unilaterally modify its tardiness policy."

The Agency further argues that the arbitration awards which the Union cites do not require "a finding that the Union did not waive its right to bargain over changes to the attendance policy." First, GLSS argues that "all three awards concerned the just cause provision of Article 15 of the Agreement." It argues that "Article 15 is not at issue herein and need not be considered to determine whether or not the Agency had the unilateral right to modify its attendance policy by modifying the 10-minute grace period for late arrival to work." Second,

GLSS argues that all three awards concerned the termination of an employee for a single violation of the body or bunny belt rule, a safety rule." It notes, however, that "the 1995 (2007) Rule Book only listed, for the most part, general safety-specific violations, and the Rule Book did not mention body belt omissions at all." It argues that "for this reason Arbitrator Dunn held it was arbitrary and capricious for the Agency to single out the body belt omission as providing grounds for summary termination." Third, it argues that "the focus of the three awards was whether or not the MBTA had issued a directive requiring the Agency to terminate employees for a single body belt offense, and the arbitrators, particularly Arbitrators Dunn and Ryan, concluded that the MBTA directives on body belts did not require summary termination for a single offense."

GLSS also argues that "any Union reliance on these arbitration awards raises the fundamental question of what the management rights language means if it doesn't permit the Agency to unilaterally modify its attendance policy." It argues that the language in Article 11 which "specifically grants the Agency 'the right to adopt from time to time reasonable rules and regulations for purposes of efficiency, safety and discipline" would "have no meaning, significance, or consequence if the Agency couldn't modify its attendance policy without first bargaining with the Union."

The Agency argues that "it must be noted that the Union has never argued that it was unreasonable for the Agency to modify the 10-minute grace period for late arrival to work." The Agency argues that "indeed, these late arrivals, even if less than 10 minutes, as well as those in excess of 10 minutes, were resulting in fines from the MBTA." It argues that "there was

and is nothing unreasonable in the desire to eliminate one of the causes of MBTA fines."

GLSS also argues that "the changes negotiated in Article 15 do not constitute a waiver of the Agency's right to unilaterally modify its attendance policy." Although the Agency acknowledges that it "negotiated ... changes into Article 15" which "involve rules which the Agency may have attempted to unilaterally promulgate," it does not concede that it has waived its contractual right to adopt "from time to time" certain rules and regulations. It argues that "there are many reasons why the Agency may want to negotiate changes to Article 15 without unilaterally modifying its Rule Book or attendance policy." It agrees that "it is sound practice to negotiate changes to the work rules during the open period of the contract when it is in negotiations for a new agreement." It argues, however, that "this sound practice is of no comfort to the Agency when it is being issued many fines by the MBTA caused by late pick-ups in April and May of 2015, more than 3½ years before the contract expires." It also rejects any argument that "the mere failure of the Agency to exercise its right [to make certain unilateral changes to its rules or regulations] in a few circumstances does not waive its right to do so in the future."

Finally, the Agency argues that "in December 2016 the Agency and the Union agreed to a 5-minute grace period for late arrival at work." Specifically, it argues that "on November 3, 2016 Marie Casteneyra e-mailed Bruce Bolduc about the new time and attendance and payroll system soon to be implemented by the Agency." It argues that "the notice to the Union attached to the e-mail included, among many other things, the proposed 5-minute grace period for late arrival at work." It argues that "the parties met on November 22, 2016 to discuss the new system

and proposed changes occasioned by it." It argues that Bolduc approved the notice to employees which included notification of the 5-minute grace period for an employee's late arrival to work." The Agency argues that "since the parties have reached an agreement on this 5-minute grace period, it would be inappropriate for the Arbitrator to issue a remedy reinstating the 10-minute grace period even if the Arbitrator believed the Agency somehow violated the Agreement in June of 2015 by unilaterally modifying the 10-minute grace period."

## 2. Unauthorized use of GLSS vehicle

The position of the Agency is -- as it is with respect to the alleged modification of the grace period -- that it "did bargain with the Union for the right to adopt from time to time reasonable rules and regulations for the purposes of efficiency, safety and discipline."

GLSS argues that its "unauthorized use of vehicle policy, including termination for a first offense, is a reasonable rule for efficiency and discipline." It argues that it "has never heard any suggestion that there is anything unreasonable about prohibiting drivers from using vehicles to go home or run a personal errand."

The Agency further argues that "there is nothing unreasonable about terminating drivers for even a first offense of unauthorized use of an Agency vehicle." First, it argues that "any such use is a knowing and intentional act." It argues that such use "is a completely different act than the body belt offenses committed in the arbitration awards introduced by the Union." It argues that "in two of those cases, the Dunn and Ryan awards, the driver had simply forgotten to use or bring the

-25-

body belt with him."  In the Boulanger case, the grievant failed to use a body belt because the passenger was not wheelchair-bound when he entered or exited the van and she did not want to abandon him by returning to the van to retrieve a body belt." GLSS argues that "while these acts may have been negligent acts, they certainly were not purposeful or intentional acts in defiance of Agency rules."  Second, it argues that "the Agency has put all drivers on notice many times in mandatory trainings and through workplace postings that taking an Agency or MBTA vehicle home or driving it for personal use is unacceptable and could result in discipline up to and including termination." Thus, it argues that "any driver committing such an offense is knowingly engaging in conduct in violation of Agency rules and knowingly engaging in conduct that subjects the driver to serious consequences."  GLSS also argues that "the Union has never alleged that the unauthorized use of vehicle policy, including discharge for a first offense, is an unreasonable rule and regulation."  Rather, it argues that it has "maintained that the agency must bargain about the rule or, at a minimum, the penalties for violation of the rule."

The Agency also argues that "the change of penalty for unauthorized use of vehicle is consistent with the directive of the MBTA."  It also argues that "the Agency bargained ford the right to follow directives of its contracting authorities, including the MBTA."  It further argues that "on January 6, 2016, the MBTA made clear to the Agency that it was necessary for the agency to terminate any driver who took an MBTA vehicle home."

* * *

## Discussion

### 1.  Grace period

I conclude that the Agency violated the Agreement on or about June 10, 2015, when it modified the 10-minute grace period for a late arrival at work without bargaining with the Union. Article 11 of the Agreement reserves certain rights to GLSS including the right to "adopt from time to time reasonable rules and regulations for the purposes of efficiency, safety and discipline."  This contractual reservation of rights, however, is not absolute.  Specifically, the first sentence of the first paragraph of Article 11 states that "except as expressly restricted by a specific provision of this Agreement" certain rights are reserved for GLSS.  I conclude that the language in Article 15 of the Agreement that "[t]he Agency may discipline or discharge employees for just cause" expressly restricts the Agency's reserved rights language.

In this case the Agency acknowledges that it unilaterally shortened the "grace period" within which bargaining unit members' late arrivals at work would not be subject to discipline from 10 minutes to five minutes.  The disciplinary just cause standard which the parties have set forth in Article 15 of the Agreement, however, is a particular express restriction on the Article 11 more general reservation of the rights which the parties established in Article 11.  Thus, this language precludes the unilateral modification which GLSS attempted to establish in this case.  Any discipline resulting from such a unilateral change must remain subject to the parties' negotiated just cause standard as set forth in Article 15.

-27-

2.  Unauthorized use of vehicles

The analysis applied to grace periods in the immediately above section applies equally to the Agency's unilateral imposition of summary discharge (in lieu of a just cause analysis of appropriate discipline) for unauthorized use of a GLSS or MBTA vehicle.  The unilateral modification of penalty for unauthorized use of vehicles may bump up against the just cause provision which the parties have set forth in Article 15. To paraphrase Arbitrator Dunn's language in his 2008 arbitration decision:

> Quite simply, the explicit "just cause" limitation in Article 15 constitutes "a specific provision of this Agreement" which expressly restricts the management rights which are listed in Article 11.  Thus the just cause language in Article 15 places a limitation upon the Article 11 listed management right of GLSS "to adopt from time to time reasonable rules and regulations for the purposes of efficiency, safety and discipline."

Remedy:

1.  Grace period

An appropriate remedy is to reverse the Agency's unilateral imposition of the five-minute grace period for tardiness and restore the status quo ante of a 10-minute grace period.

By shrinking the ten-minute grace period to a five-minute grace period in this case GLSS unilaterally imposed the possibility of discipline where no such possibility existed before (e.g.; tardiness of, say, seven minutes).  Thus, I agree with the Union that any discipline which the Agency imposed for

a five to 10 minutes' tardiness as a result of its unilateral
change of a ten-minute grace period to a five-minute grace
period must be rescinded.

GLSS argues that at some point the parties agreed to adopt
a five-minute grace period for tardiness.  To the extent to
which the parties entered into such an agreement, the date of
such agreement shall act as an endpoint of discipline rescission
as described above.

### 2.  Unauthorized use of GLSS vehicles

As is the case with the grace period issue, an appropriate
remedy is to reverse the agency's unilateral imposition of
summary discharge for the unauthorized use of a GLSS or MBTA
vehicle.  Because there is no evidence of the Agency having
issued any discipline pursuant to its unilaterally issued
summary discharge policy, there is no discipline to analyze.

### Award:

1. The Agency violated the collective bargaining agreement
on or about June 10, 2015, when it modified the 10-minute grace
period for a late arrival at work without bargaining with the
Union.

2.  The Agency violated the collective bargaining agreement
on or about February 9, 2016 when it changed the penalty for
unauthorized use of vehicles without bargaining with the Union.

3.  The Agency shall immediately rescind any discipline
which it may have issued to bargaining unit members who arrived
at work during the period between five minutes after their shift
starts and 10 minutes after their shift starts, retroactive to

-29-

the time of the unilateral imposition of the five-minute grace period and prospective to the time of any agreement between the parties with respect to a five-minute grace period.

James M. Litton
Aribitrator

Dated:  April 6, 2018